**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MALCOLM BRUCE WESTCOTT, | ) | |
| Colonel (ret.), USAR | ) | |
| 516 Jaclyn Circle | ) | |
| McDonough, GA 30253 | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| THE HONORABLE | ) | |
| FRANCIS J. HARVEY, | ) | |
| Secretary of the Army | ) | |
| Department of the Army | ) | |
| 120 Army Pentagon | ) | |
| Washington, DC 20310-1020 | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

**COMPLAINT**

**Judicial Review of Administrative Board Decision; Violations of Army Regulations;**
**Violations of Federal Statute; Violation of U.S. Constitution**

## I. JURISDICTION AND VENUE

1) This Court has jurisdiction under 28 U.S.C. § 1331. Plaintiff raises claims arising

under the U.S. Constitution, federal statutes, and military regulations.

2) The Act of Congress upon which federal question jurisdiction rests is the

Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., which permits a federal court to review

final decisions of the Department of the Army Suitability Evaluation Board ("DASEB").

3) Venue is proper because Defendant is a resident of the District of Columbia.

## II.  <u>THE PARTIES</u>

4) Malcolm B. Westcott, COL (ret.), Plaintiff, is a retired Army Reserve officer. Plaintiff resides at the address provided in the caption above.

5) Francis J. Harvey, Defendant, is the Secretary of the Army. Defendant's official place of business is the address provided in the caption above.

## III.  STATUTE OF LIMITATIONS AND<br>EXHAUSTION OF ADMINISTRATIVE REMEDIES

6) COL Westcott retired from active duty in the U.S. Army on February 1, 2003.

7) On or around June 18, 2004, COL Westcott filed an application with the DASEB requesting that the General Officer Memorandum of Reprimand be removed from his Official Military Personnel File ("OMPF").

8) On November 5, 2004, the DASEB denied COL Westcott's application for relief.

9) Exhaustion of remedies before the DASEB is a jurisdictional prerequisite to filing an application with the Army Board for the Correction of Military Records ("ABCMR"). Army Regulation 600-376, Chapter 7-6.

10) Application to the ABCMR itself is elective. COL Westcott is not required to pursue relief with the ABCMR before filing suit in this court. *Wilhelm v. Caldera*, 90 F. Supp. 2d 3 (D.D.C. 2000).

11) This court has jurisdiction over this suit.

12) COL Westcott's claim first accrued on February 1, 2003, when he retired from the Army.  COL Westcott's complaint is timely filed.

## IV. <u>STATEMENT OF FACTS</u>

13) While serving as Division Chief, Office of the Chief of the Army Reserve ("OCAR"), COL Westcott was advised that a subordinate officer had been counseled regarding his unprofessional conduct toward an enlisted woman.

14) Because of the seriousness of the allegations involved, COL Westcott requested that the Deputy Chief, Army Reserve ("DCAR"), initiate an informal investigation under Army Regulation ("AR") 15-6 to determine the facts of the matter.

15) The investigation was completed on June 12, 1998 and submitted to the DCAR.

16) As a result of the investigation, the DCAR placed a Letter of Reprimand ("MOR") in the offending soldier's Official Military Personnel File ("OMPF").

17) COL Westcott served as the offending officer's Senior Rater for an Officer Effectiveness Report ("OER") covering the period of April 1, 1998 through November 30, 1998, the period during which the AR 15-6 investigation was undertaken and completed.

18) COL Westcott signed the OER on April 23, 1999, recommending that the offending officer "be removed from active duty status as soon as possible."

19) As a result of the MOR and the negative OER, the offending officer complained to the Department of Defense Inspector General ("DODIG"), alleging that COL Westcott had violated provisions of the Military Whistleblower Protection Act.

20) The DODIG initiated an investigation into the matter.

21) On May 27, 1999, the Army Chief of Staff announced that COL Westcott had been selected for promotion to Brigadier General.

22) By letter dated November 15, 1999, the DODIG informed COL Westcott that the investigation failed to substantiate the allegations, and that the unfavorable actions taken against the offending officer were justified.

23) Shortly thereafter, the Army telephonically informed COL Westcott that a second complaint had been filed with the DODIG, alleging that COL Westcott and other senior Army officers, notably MG Max Baratz, within OCAR had engaged in misconduct in the execution of their duties.

24) The hotline call, placed on June 1, 1999, was referred to the DAIG and Army Criminal Investigation Division ("CID") for appropriate action.

### The CID Investigation

25) The CID began an extensive investigation into the allegations during the summer of 1999.

26) Importantly, the CID only identified COL Westcott as a witness in the investigation, not as subject.

27) The focus of the investigation was COL Westcott's former rater, MG Baratz.

28) The allegations giving rise to the investigation were that MG Baratz had violated government ethics laws during and after his tenure as Chief of the Army Reserve.

29) Because the CID assured COL Westcott that he was not a subject of their investigation, COL Westcott agreed to cooperate fully with the investigators.

30) On October 8, 1999 and October 21, 1999, COL Westcott submitted to questioning by the CID investigators.

31) When the CID completed its investigation, the matter was referred to the Office of the United States Attorney for possible criminal prosecution.

32) On two occasions the U.S. Attorney's Office subpoenaed COL Westcott to testify before a federal grand jury.

33) As with the CID investigators, the U.S. Attorney's Office assured COL Westcott, through his military counsel, that he was not a subject of the investigation.

34) COL Westcott complied with the subpoenas, and provided extensive testimony to the members of the grand jury.

35) After hearing all relevant evidence in the case, the grand jury failed to return an indictment against MG Baratz.

### The DAIG Investigation

36) In March, 2000, COL Westcott's military counsel was informed that the DAIG was reviewing the case for possible investigative action against COL Westcott for his role in the allegations against MG Baratz.

37) COL Westcott's military counsel was again told that the focus of the investigation was MG Baratz, not COL Westcott.

38) Because COL Westcott's promotion was being held-up while he was occupying a Brigadier General billet, COL Westcott and his counsel made numerous attempts to clarify the status of the DAIG's concerns and to expedite an investigation if one were to be undertaken.

39) On two subsequent occasions, COL Westcott's military counsel made further inquiries with the DAIG, beseeching them to expedite their investigation of COL Westcott, if an investigation were to take place at all.

40) In a letter dated October 31, 2000, LTC Scott L. Kilgore, Area Defense Counsel, stated

> your office informed me [in response to a memorandum of August 11, 2000] that it would conduct a preliminary inquiry (PI) into the

credibility of the allegations against COL Westcott. Now, almost three months later, I have learned that the PI is just getting underway. …No installation commander would tolerate such a lethargic investigation from his or her officers (or NCOs for that matter!). Yet, the DAIG continues to plod along. No soldier should endure the unending purgatory that befalls those who are the target of DAIG complaints. Anything you can do to expedite the DAIG review of COL Westcott's case is sincerely appreciated.

41) Over three months later, on February 7, 2001, the DAIG issued a Directive for Investigation authorizing investigators to conduct an inquiry into allegations involving COL Westcott.

42) The Directive stated that "[o]n 9 March 2000, CID referred COL Westcott's allegations to DAIG for appropriate action. On 22 March 2000, CID informed DAIG that their investigation did not establish any evidence of criminal wrongdoing on the part of COL Westcott."

43) The DAIG determined that two allegations warranted further investigation: 1) whether COL Westcott performed his duties as a contracting officer's representative in a negligent manner; and 2) whether COL Westcott violated standards of ethical conduct in contracting and related activities pertaining to a private corporation that engaged in defense contracting.

44) The DAIG investigation ultimately substantiated only the first of these two allegations.

45) As noted above, in March, 2000, COL Westcott first learned that the DAIG was considering an investigation into his role in the allegations against MG Baratz.

46) During the entire time the DAIG was undertaking a preliminary investigation of COL Westcott's involvement in the matters giving rise to the CID investigation into MG Baratz, the

6

DAIG did not, either in response to queries by COL Westcott's military attorneys, or of its own accord, advise COL Westcott of the grounds for the preliminary investigation.

47) COL Westcott was notified by telephone that the DAIG had completed its preliminary investigation and that a full DAIG investigation was to be undertaken.

48) At no time prior to his interview with DAIG investigators was COL Westcott informed in writing or orally of the scope of the investigation or of the specific allegations forming the basis of the investigation.

49) Only on April 23, 2001, when COL Westcott was interviewed by the DAIG investigators, the interviewer informed COL Westcott as follows:

> [y]you are advised that you are suspected of the following allegations, which we want to question you about: that you performed your duties as a COTR in a negligent manner and violated standards of ethical conduct in contracting and related activities pertaining to SY Technology, Incorporated.

50) The investigator proceeded to question COL Westcott on a wide range of subjects, and with great precision, reflecting the time and care with which the investigator had prepared for the interview.

51) The questioning required COL Westcott to recall minute details of events that transpired years prior. The interview lasted some 6 hours, and generated 83 pages of typed transcript.

52) In response to a Freedom of Information Act and Privacy Act request, COL Westcott was provided with a highly-redacted copy of the DAIG Report of Investigation ("ROI").

53) In numerous instances, entire pages of the ROI were redacted, making it extremely difficult for COL Westcott to assess the integrity of the investigative process and the bases for the investigative findings.

54) The Exhibit List, at p. 78 of the ROI, indicates that the DAIG relied almost exclusively on transcripts of testimony provided by witnesses to CID investigators.

55) The ROI specifies 17 instances in which the investigators relied on transcripts of CID testimony.

56) COL Westcott was never informed of the identities of these witnesses, nor was he provided with transcripts of their CID testimony.

57) In addition to COL Wescott's testimony, the ROI contains redacted transcripts of DAIG interviews with three witnesses.

**The Letter of Reprimand**

58) After the investigation was completed, the ROI was forwarded to General John M. Keane, the Army Vice Chief of Staff, who approved the report on July 9, 2001.

59) The ROI substantiated one of the two allegations against COL Westcott: that he had negligently performed his duties as a contracting officer's technical representative ("COTR").

60) On October 19, 2001, General Keane issued COL Westcott a MOR based solely on the findings of the ROI.

61) The MOR was not accompanied by any of the documents on which the allegations were based, nor did it specify those documents in a separate listing.

62) The MOR did not state that COL Westcott enjoyed an opportunity to review those documents on a previous occasion.

63) COL Westcott submitted a detailed rebuttal of the allegations in his response to the MOR.

64) His rebuttal included sworn statements from numerous individuals familiar with the case, including MG Baratz.

65) Mark J. Lumer, Contracting Executive and Principle Assistant Responsible for Contracting for the U.S. Army Space and Missile Defense Command, reviewed the complete file of the contract that formed the basis of the allegations, and concluded that there was no evidence whatever of any wrongdoing on COL Westcott's part.

66) Mr. Lumer noted that he had not met COL Westcott, and therefore was in a position to provide an objective and independent assessment of the matter.

67) According to Mr. Lumer:

> I have found no evidence of any improper conduct on your part, nor even the appearance of improper conduct. …In summary, you had no authority over the contracting effort whatsoever, and you took no action that could be considered improper (given your lack of authority you couldn't have done so anyway). I am bewildered by any accusation to the contrary—there's just no evidence at all of any impropriety.

68) On October 19, 2001, MG Keane approved the MOR for placement in COL Westcott's OMPF.

69) By memorandum dated April 5, 2002, COL Westcott submitted a rebuttal to MG Keane, requesting that the MOR not be placed in his OMPF due to factual and other errors in the DAIG investigation and ROI.

**The Substantiated Allegation**

70) As noted above, the DAIG investigation substantiated the allegation that COL Westcott acted negligently in the performance of his duties as Contracting Officer Technical Representative ("COTR").

71) While serving as Chief of Operations, Readiness, Training, and Force Development Directorate, U.S. Army Reserve, COL Westcott was directed by his Commanding General, MG Max Baratz, to pursue an Army Reserve force integration support agreement with a company

that was reputable in the experience of the Active Army, and, ideally, one that already was being used by the Active Army to support their own force management processes.

72) MG Baratz' initiative was based largely on the significant involvement of contractors in support of Headquarters, Department of the Army, during Total Army Analysis ("TAA") 05, the Quadrennial Defense Review, the Reserve Component Offsite, and other major force initiatives.

73) Based on the direction of MG Baratz, COL Westcott met with COL Steven Cook, the Active Army's leader for Force Development.

74) COL Cook identified a particular private company, SY Technology, as being the sole provider of contractor support for the Total Army Analysis 05 planning and execution function of his Program Branch.

75) COL Cook expressed strong satisfaction with the results of SY Technology's efforts.

76) Based on the Active Army's recommendation, COL Westcott met with SY Technology officials in late July, 1997 to discuss the prospects of their providing support for MG Baratz' initiatives with the Army Reserve.

77) COL Westcott was favorably impressed with SY Tech, and recommended the company to MG Baratz, who further directed that COL Westcott pursue contractual relations with SY Technology.

78) COL Westcott then sought and obtained advice on the contracting process with Active Army officials.

79) COL Westcott was advised that the immediate contractor support that MG Baratz desired was available only by the addition of a "task order" to an existing contract that had been competitively awarded by the Army between SY Tech and the U.S. Army Space Command.

80) The Active Army was at the time using this contract for fundamentally the same service.

81) After coordinating with Mr. Max Delgado, Contracting Officer ("COR") with the Army Space Command, the Office of the Chief, Army Reserve ("OCAR") submitted a task order in September, 1997 to the Army Space Command delineating SY Tech support requirements.

82) SY Tech was tasked to "support the horizontal and vertical integration necessary to satisfy the Chief, Army Reserve's missions, goals and objectives in the force management area...."

83) Army Space Command then submitted the task order to SY Tech, which prepared a Task Order Plan ("TOP") designed to achieve the stated objectives.

84) COL Westcott, as the main point-of-contact at OCAR for the SY Tech project, approved the TOP.

85) Expenditures for the effort were then authorized by MG Baratz to cover the period of September 1997 through September 1998.

86) Mr. Max Delgado was the COR for the project. As such, it was his duty to ensure that the task order was executed in compliance with applicable rules and regulations.

87) COL Westcott was never designated as either COR or COTR for this project.

88) In May, 1998, MG Baratz retired from his post as Chief, Army Reserve, and in July, 1998 began employment SY Technology.

89) The allegations that formed the basis of the DAIG investigation pertained to MG Baratz' subsequent employment with SY Tech and his involvement with ongoing initiatives of the new Chief, Army Reserve.

90) The DAIG substantiated three specific findings of fact against COL Westcott: 1) he helped obtain a task order for SY Technology that ultimately benefited MG Baratz after he began employment with that company; 2) he was negligent in the performance of his duties because he failed to discuss in a quarterly evaluation a Senior Leadership Training Program involving SY Tech and MG Baratz; and 3) he allowed SY Tech to draft its own performance appraisals, thereby compromising the integrity of the awards fee board system.

### *Withholding of COL Westcott's Name From the BG Promotion List*

91) On May 25, 1999, the Army announced that COL Westcott had been selected to serve as Deputy Chief, Army Reserve, a Brigadier General billet.

92) On June 29, 1999, COL Westcott was considered for promotion by the June 1999 U.S. Army Reserve General Officer Promotion Selection Board, and was selected for promotion to the rank of Brigadier General.

93) September 22, 1999, the Secretary of the Army forwarded the results of the promotion selection board to the U.S. Senate for confirmation.

94) On September 22, 1999, the Secretary withheld COL Westcott's nomination as a result of the filing of the anonymous DODIG complaint on June 1, 1999.

95) At the time the Secretary withheld COL Westcott's name from the promotion selection list, COL Westcott was not the subject of any investigation, whether conducted by the DAIG or the CID.

96) On November 5, 1999, the Senate confirmed the remaining officers on the promotion selection list.

### COL Westcott's Retirement

97) On February 1, 2003, COL Westcott voluntarily retired from the Army Reserve.

**Application to the Department of the Army Suitability Evaluation Board**

98) On or around June 18, 2004, COL Westcott filed an application with the DASEB.

99) The DASEB is a board of officers convened pursuant to Army Regulation 600-37, "Unfavorable Information."

100) Army Regulation 600-37, Chapter 6, describes the organization and procedures of the DASEB.

101) Army Regulation 600-37, Chapter 7 describes the "appeals and petitions" functions and procedures of the DASEB.

102) By memorandum November 5, 2004, the DASEB denied all relief requested. The DASEB did not provide a statement of reasons for its denial of COL Westcott's application.

## VI. CLAIMS

### COUNT I

**THE ARMY VIOLATED COL WESTCOTT'S
PROCEDURAL RIGHTS UNDER AR 600-37.**

103) Army policy on the inclusion of unfavorable information in an officer's OMPF is stated in AR 600-37, Paragraph 3-2(a) as follows:

> [e]xcept as indicated in paragraph 3-3, unfavorable information will not be included in an official personnel file unless the recipient has been given the chance to review the documentation that serves as the basis for the proposed filing and make a written statement, or to decline, in writing, to make such a statement.

104) As regards letters of reprimand, Paragraph 3-4(b)(1) provides that a letter that is intended to be included in a soldier's OMPF will "[b]e referred to the recipient concerned for comment according to paragraph 3-6...."

105) Paragraph 3-4(b)(1)(a) further provides that

[t]his referral will also <u>include and list applicable portions of investigations, reports and other documents that serve, in part or in whole, as the basis for the letter</u>, providing the recipient was not previously provided an opportunity to respond to information reflected in that documentation." (Emphasis added.)

106) AR 600-37 thus creates an independent right of notice and response for the affected officer.

107) The officer is to be provided, prior to exercising his right of rebuttal, and prior to the placing of the MOR in his OMPF, with all documents upon which the allegations forming the basis of the MOR are contained.

108) The Army failed to comply with the provisions of AR 600-37.

109) The Army failed to include and list with the MOR the documents, reports, and other information upon which the MOR was based, as required by paragraph 3-4(b)(1)(a).

110) The DASEB did not address this allegation in its decision memorandum.

111) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

## COUNT II

**THE ARMY VIOLATED 10 U.S.C. § 14311 AND AR 600-8-29 BY FAILING TO NOTIFY COL WESTCOTT IN WRITING OF ITS DECISION TO DELAY HIS PROMOTION AND PROVIDE HIM AN OPPORTUNITY TO RESPOND IN WRITING TO THE SECRETARY OF THE ARMY.**

112) 10 U.S.C. § 14311, paragraph (c)(1) provides that "[t]he appointment of an officer to a higher grade may not be delayed under subsection (a) or (b) unless the officer is given written notice of the grounds for the delay."

113) Paragraph (c)(2) further provides that "[a]n officer whose promotion is delayed under subsection (a) or (b) shall be given an opportunity to make a written statement to the

Secretary of the military department concerned in response to the action taken. The Secretary shall give consideration to any such statement."

114) AR 600-8-29, paragraph 1-20, is responsive to the Congressional requirements of 10 U.S.C. § 14311, and provides that "[t]he office preparing the DA Form 268 [Report to Suspend Favorable Personnel Actions (Flag)] must give that officer written notice of the reason for the delay of promotion before its imposition or as soon thereafter as possible…. An officer whose promotion has been delayed may make a written statement, expeditiously forwarded through the chain of command, to the Secretary of the Army…."

115) The Army failed to notify COL Westcott in writing of the grounds for the delay and afford him an opportunity to respond.

116) In response to COL Westcott's FOIA request, the Army stated that "[w]e have conducted a thorough search in our organization, and no records were found [pertaining to the Army's decision to delay COL Westcott's promotion]."

117) This error severely prejudiced COL Westcott by depriving him of an opportunity to clarify his involvement in the contracting process at a point where he could have avoided the humiliation and losses associated with his promotion delay.

118) More than one year would pass before COL Westcott would learn even the rudiments of the allegations against him.

119) The DASEB did not address this allegation in its decision memorandum.

120) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

## COUNT III

### THE ARMY HAD NO BASIS UNDER 10 U.S.C. § 14311 OR AR 600-8-29 FOR DELAYING COL WESTCOTT'S PROMOTION.

121) 10 U.S.C. § 14311, paragraph (a)(1)-(c) provides that "the appointment of an officer to a higher grade may be delayed if … an investigation is being conducted to determine whether disciplinary action of any kind should be brought against the officer."

122) On July 22, 1999, the DAIG recommended that the allegations against COL Westcott and MG Baratz be referred to a preliminary inquiry.

123) On February 7, 2001, the DAIG requested and obtained a directive for investigation to "conduct an inspector general investigation" into COL Westcott's role in the allegations against MG Baratz.

124) The Secretary of the Army withheld COL Westcott's name from the promotion selection list on September 22, 1999.

125) The preliminary inquiry must have been conducted between July 22, 1999 and August 16, 1999, on which date the DAIG recommended that the allegations against MG Baratz and COL Westcott be referred to the Army CID.

126) On February 7, 2001, when the DAIG obtained a Directive for Investigation, the requisite authority for conducting a DAIG investigation, COL Westcott became the subject of an investigation geared toward determining whether "whether disciplinary action of any kind should be brought against the officer."

127) At the time the Secretary of the Army directed COL Westcott's removal from the Brigadier General Promotion List on September 22, 1999, COL Westcott was not the subject of an investigation satisfying the requirements of 10 U.S.C. § 14311 and AR 600-8-29.

128) The DASEB did not address this allegation in its decision memorandum.

129) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

## COUNT IV

**FAILURE TO RESOLVE COL WESTCOTT'S PROMOTION STATUS WITHIN THE 18-MONTH TIME PERIOD SPECIFIED BY 10 U.S.C. § 14311 AND AR 600-8-29.**

130) 10 U.S.C. § 14311 provides the congressional authority for the promotion of military officers.

131) Under this provision, the promotion status of an officer whose promotion has been lawfully delayed must be resolved within a period of 18 months from the date when the officer would otherwise have been promoted.

132) According to paragraph (d) of section 14311:

> [t]he appointment of an officer to a higher grade may not be delayed under subsection (a) or (b) for more than six months after the date on which the officer otherwise would have been promoted unless the Secretary concerned specifies a further period of delay. An officer's appointment may not be delayed more than 90 days after final action has been taken in any criminal case against such officer in a Federal or State court of competent jurisdiction or more than 90 days after final action has been taken in any court-martial case against such officer. Except for court action, a promotion may not be delayed more than 18 months after the date on which such officer would otherwise have been appointed.

133) 10 U.S.C. § 14311(a)(1)(A) is applicable to officers, such as COL Westcott, whose promotions have been delayed on the grounds that "an investigation is being conducted to determine whether any disciplinary action of any kind should be brought against the officer...."

134) No general exception is provided for the 18-month time limit.

135) The pertinent U.S. Army regulation closely follows 10 U.S.C. § 14311.

136) AR 600-8-29, Paragraph 1-20(b), provides that '[a]n officer's promotion will not be delayed more than 6 months unless the [Secretary of the Army] or the Secretary's designee grants a further delay."

137) Paragraph 1-20(b) also provides that a further period of delay:

> is deemed to have been granted in any case that has been referred to a promotion review board; the delay in such cases extends until the [Secretary of the Army] takes final action. In no case may an officer's promotion be delayed more than 90 days after final action in any court martial or criminal case against the officer in Federal or State court, or more than 18 months after the date on which the officer would otherwise have been appointed, whichever is later.

138) COL Westcott was selected for promotion to Brigadier General on June 29, 1999.

139) On September 22, 1999, the Secretary of the Army forwarded the results of the promotion board to the U.S. Senate for confirmation.

140) The Secretary of the Army, however, withheld COL Westcott's name from the promotion list pending completion of the DAIG investigation, effective September 22, 1999.

141) On June 15, 2002, COL Westcott submitted a request for Voluntary Resignation.

142) On July 15, 2002, the Army advised COL Westcott that he was being referred to a Promotion Review Board for a recommendation of retention or removal from the June 1999 Army Reserve General Officer Promotion Selection List.

143) COL Westcott's request for Voluntary Retirement was approved and he formally retired from Army service on February 1, 2003.

144) The Army failed to resolve COL Westcott's promotion status within the required 18-month period of time.

145) According to 10 U.S.C. § 14311, COL Wesctott's promotion status should have been fully resolved on or around March 22, 2001.

146) The DASEB did not address this allegation in its decision memorandum.

147) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

## COUNT V

**THE ARMY VIOLATED COL WESTCOTT'S RIGHT TO DUE PROCESS OF LAW BY FAILING TO PROVIDE TIMELY NOTICE OF, AND AN OPPORTUNITY TO RESPOND TO, ADVERSE INFORMATION**

148) AR 20-1, Paragraph 7-6, establishes the policy that an individual who is the subject of investigation shall be afforded an opportunity to comment on any unfavorable information generated as a result of the investigation.

149) Paragraph 7-6 specifically provides that "[i]f the individual was not informed of the unfavorable information during the IG investigation, the IG will advise the person concerned, orally or in writing, of its substance before the IG investigation is completed."

150) The Inquiries and Investigations Guide, Chapter II, Paragraph 2(a)1, provides that:

> individuals about whom you have developed unfavorable information and will include that information in your report, have the right to know the information and the right to have the opportunity to comment on it should they so desire.

151) AR 20-1 was recently revised and republished, and explicitly addresses the investigator's duty to disclose unfavorable information.

152) Paragraph 8-6 provides that "[t]he individual has a right to know of the unfavorable information <u>during the IG inquiry or investigation</u>. The IG will orally notify the person concerned (notification) of the allegations and interview the subject or suspect before the IG inquiry or investigation is completed. The IG will provide the person an opportunity to comment on the unfavorable information during the interview process." (Emphasis added.)

153) A subject of a DAIG investigation against whom adverse action is taken on the basis of a DAIG ROI has procedural rights beyond the basic notice and response requirements.

154) AR 20-1, Paragraph 3-3(a) provides that:

> [w]hen an IG record is used as the basis for adverse action, the individual concerned may be entitled to additional due process rights that will breach the confidentiality of witnesses and IG opinions, conclusions, and recommendations. Commanders, State AGs, and directing authorities must consider this impact when deciding whether to request the use of an IG record for adverse action.

155) COL Westcott and his military counsel first learned that the DAIG was considering an investigation of COL Wescott in March, 2000.

156) The DAIG did not inform COL Westcott of the basis for the potential investigation, despite repeated requests for this information from his military counsel.

157) The DAIG informed COL Westcott that a full investigation of allegations against him was to be undertaken.

158) The formal investigation covered a six-month period, from February 7, 2001 until July 9, 2001.

159) At no time prior to his interview with the DAIG was COL Westcott informed of the allegations against him or the scope of the investigation.

160) Nor did the investigator inform COL Westcott of the specific factual bases on which the key allegation of negligence was based.

161) Only at the time of his 6-hour interview with the DAIG investigator was COL Wescott advised of the allegations against him, and then only in the most general terms.

162) At no time during the DAIG's interview with COL Westcott, however, did the investigator inform COL Westcott of the specific acts or omissions forming the basis of the allegation of negligence.

163) The DASEB did not address this allegation in its decision memorandum.

164) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

<u>COUNT VI</u>

**THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
THE FACTUAL FINDINGS GIVING RISE TO THE MOR**

165) The DAIG investigation found that COL Westcott acted negligently in the performance of his duties as COTR on TOs involving services by SY Tech.

166) This finding was included in the MOR prepared by General Keane, who stated, "[y]our performance as a COTR fell far short of [the required standard of performance]. Moreover, your failure to perform your COTR duties properly <u>may have</u> resulted in the award of fees that did not accurately reflect the contractor's performance and created a perception of impropriety and misdirected loyalty." (Emphasis added.)

167) COL Westcott was not designated as COTR on the relevant TOs, nor was he ever instructed in the duties of a COTR or trained in the execution of those duties.

168) COL Westcott's role in the TOs was limited to that of primary point of contact.

169) The term COTR was restricted to individuals who received specific training and had specialized knowledge of government contracting operations.

170) In his testimony to the DAIG, COL Westcott stated "[i]n terms of training for me specifically, they provided nothing, formal or informal. In terms of being assigned in writing, I have—as of today, I still have not been assigned in writing as a COTR or TOR for that matter."

171) According to Mark J. Lumer, Principal Assistant for Contracting, U.S. Army Space and Missile Defense Command:

> I must advise you that you were never a COR under this contract, since all CORs must be appointed in writing by a contracting officer and there is no evidence in the official file that you were ever designated as such. You were also referred to as a 'technical monitor' in some documents. I must advise you that you were never a technical monitor either, since, again, there is no formal letter of appointment signed by a contracting officer designating you as such. <u>About the most I can attribute to you pursuant to this contract is that you were a customer and a receiver of the services procured—you had no official standing whatsoever.</u> It is possible that you were designated a technical representative by Max Delgado, but the official contract file contains no evidence of that appointment either. (Emphasis added.)

172) MG Thomas J. Plewes, former Chief, Army Reserve, noted in his statement on behalf of COL Westcott that, "[i]n my mind, the charges that have been substantiated [against COL Westcott] stem from confusion over contracting roles and obligations, not from any attempt to abuse the process."

### Role in Obtaining $100,000 for a SY Tech Task Order

173) The MOR stated that: [o]nly days before the CAR left active duty, you were instrumental in obtaining approximately $100,000 for a task order to SY Tech for a general USARC force development program. Within the first week of the former CAR [MG Baratz] beginning employment with SY Tech, you were involved in approving a plan and coordinating funding for SY Tech's projected fiscal year contract support that, for the first time, including senior officer training."

174) The DAIG addressed this allegation in the context of the unsubstantiated allegation that COL Westcott violated ethical standards in government contracting.

175) The DAIG concluded as follows: "…further investigation into the details of each transaction failed to demonstrate that COL Westcott had done anything improper. Initial appearances aside, a reasonable person with knowledge of all the facts would not hold a perception that COL Westcott engaged in an impropriety."

176) In its ROI, the DAIG stated, "$364,000 were released from the CAR's withholding account to fund several TOs initiated by COL Westcott, including TO# 98-246 and TO# 97-139. …[MG Baratz] started his employment with SY Tech in Atlanta on 1 July 1998; the same day TO# 98-246 began. …Evidence established that SY Tech billed [MG Baratz] 176 hours worked in July 1998 under TO# 98-246."

177) TO# 97-139 was approved and initiated in September, 1997, when MG Baratz was still on active duty.

178) In May, 1998, a routine modification to TO# 97-139 was made to add two additional employees to the newly reorganized DCOPS and Directorate of Force Programs.

179) The modification responded directly to initiatives approved by MG Plewes, the new Chief, Army Reserve.

180) COL Westcott's actions were directed by the Chief, Army Reserve, the Deputy Chief, Army Reserve, and the Director of Staff, Office of the Chief, Army Reserve.

181) COL Westcott had no authority over the Senior Leaders withholding account, and could not authorize the release of funds from that account.

### Negligent Supervision of a TO Under Which MG Baratz Benefited

182) The substantiated allegation against COL Westcott was that he acted negligently in the performance of his duties as COTR.

183) A specific finding of fact was that he had been negligent in his supervision of a TO under which MG Baratz directly benefited financially.

184) In the Summary of Facts, the ROI provides as evidence of COL Westcott's negligent conduct of his duties the fact that MG Baratz:

> worked 61 percent of the total hours that SY Tech billed under the TO for July 1998. …SY Tech, in their quarterly performance summary, did not identify MG Baratz as a contributing member, nor was he identified in the TO plan (TOP) as a supporting SY Tech employee. COL Westcott's duties included monitoring the contractor's performance and the quality of their work. The [Contracting Officer] depended on [COL Westcott's] input and verification of reports.  …COL Westcott's testimony indicated he was unaware of MG Baratz being billed under this TO, and a paper trail was not established indicating that COL Westcott would necessarily have known that MG Baratz was billed under the TO. This unawareness indicated COL Westcott's lack of supervision for TO# 98-246 execution. (Emphasis added.)

185) The ROI concluded that it was "unreasonable that a specific contractor, MG Baratz, who provided almost 60 percent of the service oriented work effort over a 3-month period, would not be known to [COL Westcott]. This was especially true because COL Westcott identified MG Baratz as his mentor and they had a close personal relationship." (Emphasis added.)

186) The DAIG investigators also concluded that "a paper trail was not established indicating that COL Westcott would necessarily have known that MG Baratz was billed under the TO."

### Failure to Adequately Monitor and Report SLTP Activity

187) The DAIG found that COL Westcott reviewed and approved a TOP under which MG Baratz was designated a principal provider of services.

188) SY Tech's delivery of a Senior Leadership Training Program (SLTP) to senior officers in the Army Reserve was a major part of the TO.

189) SLTP was implemented by memorandum of LTG Plewes, dated October 21, 1998.

190) The DAIG found that:

> COL Westcott should have been attentive and monitored the SLTP because of command involvement and because that was his COTR duty. SLTP was identified as one of the work products (deliverables) that SY Tech was to deliver in their TOP, which was approved by COL Westcott. The SLTP was a major cost factor on this TO. COL Westcott failed in his COTR duties by not monitoring/evaluating ST Tech's performance, and by not being aware of a contract deliverable.

191) To support this conclusion, the DAIG stated, "[i]t was considered unreasonable that COL Westcott would not have known of the first SLTP session—a session taught by MG Baratz. This was especially true because of COL Westcott identifying MG Baratz as his mentor and they had a close relationship. In addition, the current CAR recognized SLTP as a major training deficiency amongst USAR leaders." (Emphasis added.)

192) COL Westcott did not address the SLTP training in a January 1999 quarterly report he prepared on SY Tech's performance, and stated that he was unaware of a SLTP training that was conducted in November, 1998.

193) Contrary to the findings of the DAIG, no SLTP training was conducted in November, 1998.

194) The DAIG mistakenly referred to a Senior Leader's Meeting, a periodic gathering of senior Army Reserve officers to discuss various issues and challenges facing their forces.

195) The meeting was held in the offices of SY Tech in Colorado Springs, Colorado for reasons of convenience.

196) SY Tech did not participate in the meeting and no SLTP training occurred.

197) COL Westcott therefore had no reason to report on the meeting in the specified quarterly evaluation.

198) COL Westcott's involvement in supervising the SLTP initiative was extremely limited. William T. Lee was the designated COTR for the project.

199) Mr. Lee stated that during his tenure as COTR for the SLTP initiative, he "never received any questions or concerns from anyone regarding the performance of this contract, either during my tenure as Training Division Chief or after. During my tenure as the COTR for the SLTP, I never discussed the program with Colonel Westcott nor was his name ever mentioned in connection with the contract, its funding or its execution."

200) The DAIG's conclusion was reflected in General Keane's MOR, in which he stated:

> [y]our perfunctory approach to your duties gave rise to the appearance that your loyalties lay less with the U.S. Army and more with your former boss. …You failed to note in your January 1997 quarterly performance evaluation a senior leadership training seminar—a key aspect of the task order—that your former boss developed and presented."

### Preparation of SY Tech Performance Evaluations

201) The DAIG found that COL Westcott "permitted the contractor to draft its own performance appraisal, which compromised the integrity of the awards fee board system. He should have provided input and personally approved all of SY Tech's performance evaluations."

202) The factual basis for this conclusion appears to have been statements by two of COL Westcott's subordinates, COL Fields and Ray Meadows, who stated to the DAIG that they were not involved in drafting the performance evaluations at issue.

203) In his interview with COL Westcott, the DAIG investigator stated, "Sir, I do have evidence that neither one of those participated in writing the verbiage" of the evaluations.

204) Beyond the statements referred to by the investigator, however, no additional evidence was adduced the DAIG to demonstrate by a preponderance of the evidence that COL Westcott allowed SY Tech officials to prepare their own evaluations with the specified intent of

permitting MG Baratz or other former Army officers to obtain personal advantage at the expense of the Army.

205) When asked whether he allowed SY Tech to prepare its own evaluations, COL Westcott responded, "I don't believe so. I mean I just don't know."

206) Contrary evidence in the form of a sworn statement prepared by the CEO of SY Tech was provided to MG Keane in which the company categorically denied that it prepared its own evaluation reports.

207) The DAIG stated, "COL Westcott testified that he did not know who produced SY Tech's performance evaluation reports."

208) COL Westcott admitted to the DAIG that he did not produce all of SY Tech's performance evaluations, and that it was possible that SY Tech may have produced some of them.

209) The President of SY Tech, however, prepared a statement in which he denied that the company ever had done so.

210) The DAIG failed to inquire of SY Tech on this crucial point.

211) The DAIG neither sought nor obtained corroborating evidence from the company alleged to have prepared its own evaluations.

212) The DAIG produced no documentary evidence demonstrating, or even tending to suggest, that SY Tech officials prepared the evaluations.

213) The DAIG produced no e-mails, computer files, hard copy drafts of the evaluations, or any other materials as evidence to support its case against COL Westcott on this point.

214) The DASEB did not address COL Westcott's arguments in its decision memorandum.

215) The DASEB's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant him the following relief:

(1) Order the Secretary of the Army to expunge from Plaintiff's military record the MOR issued by MG Keane and any other documents containing references to adverse actions taken against Plaintiff;

(2) Order the Secretary of the Army to expunge from Plaintiff's military record all documents referencing the DAIG investigation and the ROI;

(3) Order the Secretary of the Army to expunge from Plaintiff's record all documents pertaining to his removal from the Brigadier General Promotion List;

(4) Award Plaintiff costs expended in pursuit of this action; and

(5) Award Plaintiff attorney fees in accordance with the Equal Access to Justice Act.


Respectfully submitted,


David P. Sheldon (D.C. Bar # 446039)

The Law Offices of David P. Sheldon, PLLC
512 8th Street, S.E.
Washington, DC 20003
Tel: 202-546-9575
Fax: 202-546-0135

Raymond J. Toney (RT 9824)
*Pro Hac Vice*

The Law Office of Raymond J. Toney
34-16 30th Avenue, Third Floor
Astoria, NY 11103
Tel: 718-726-3656
Fax: 661-459-0476

*Attorneys for Plaintiff*