# DEPARTMENT OF THE ARMY SUITABILITY EVALUATION BOARD

| | |
|---|---|
| *In the matter of* ) | |
| ) | |
| MALCOLM B. WESTCOTT ) | Docket No. |
| COL, USAR (Ret.) ) | |
| ■■■■■■■■ ) | |
| ) | |
| *Applicant.* ) | |

## Memorandum in Support of Application for Removal of Memorandum of Reprimand

### *Introduction*

Malcolm B. Westcott, COL, USA (Ret.), served the Army and our Nation with great distinction for over 30 years. COL Westcott's performance history reveals an exceptionally capable officer of the highest ethical and professional standards. COL Westcott's leadership abilities, intelligence, and dedication to our national defense, as so thoroughly documented in his performance history, are wholly beyond reproach. In fact, his conduct and performance were so outstanding that he was selected for promotion to the rank of Brigadier General.

Unfortunately, however, COL Westcott never enjoyed the privileges, responsibilities, and honor that come with serving as a General Officer. COL Westcott's promotion to Brigadier General was stolen from him by the false allegations of an embittered and failed officer whom COL Westcott had disciplined years prior, and a resulting Department of the Army Inspector General ("DAIG") investigation characterized by egregious procedural violations, gross factual inaccuracies, and, seemingly, ill-motive. Based on the DIAG investigative findings, a Letter of Reprimand ("LOR") was placed in COL Westcott's Official Military Personnel File ("OMPF"), effectively ending his highly distinguished military career.

On September 22, 1999, at a time when COL Westcott was not identified as a subject or suspect of any active investigation, the Secretary of the Army withheld COL Westcott's name from the Brigadier General Promotion List. COL Westcott's promotion languished within the Department of Army for over two years while the Army Criminal Investigation Division ("CID") and the DAIG undertook extensive investigations into the allegations involving COL Westcott. Only on July 9, 2001 did the DAIG conclude that a single allegation against COL Westcott—that he had been negligent[1] in the performance of his COTR duties—had been substantiated.

The violations of law and factual inaccuracies that characterized this process deprived COL Westcott not only of his promotion to Brigadier General, but also of his fundamental procedural rights under Army regulations and federal statute. To illustrate, the Secretary of the Army never advised COL Westcott that his promotion was being withheld. COL Westcott was never informed in writing of the allegations against him nor of the scope of, and authority for, the DAIG investigation. COL Westcott did not learn of the allegations against him until he was interviewed by the DAIG over a period of six hours. And he was never was afforded an opportunity to review the documents and testimony on which the DAIG based its finding. As a result, the Army emasculated COL Westcott's fundamental right to defend himself fairly against the allegations. The procedures employed by the Department of the Army in this case, which truly constituted "trial by ambush," were an affront to our Nation's most cherished principles of justice.

COL Westcott also will demonstrate here that, in addition to the egregious procedural errors that characterized this process, the allegations upon which the LOR was based were

---

[1] The DAIG did not specify what, if any, standard it applied to determine whether the performance was negligent.

unfounded and untrue.[2] There was insufficient evidence to support the conclusions of the DAIG investigation, and the evidence that does exist was misinterpreted and hinged largely on an erroneous inference drawn by the DAIG investigators. As will be shown, this inference—that COL Westcott's relationship with his former senior rater, MG Max Baratz, was personal to the point that COL Westcott would act to benefit MG Baratz financially and professionally at the expense of the Army and the American taxpayer—provided the glue that held the allegations against COL Westcott together. This inference was carried over into the LOR, which conspicuously began by stating, "[y]ou and the former Chief, Army Reserves (CAR), had a long-standing professional and personal relationship. He was your senior rater from 1993 through 1998, except during your assignment to the Army War College." Without this unfounded inference, there simply was no case against COL Westcott. For this reason, no doubt, the DAIG resorted to its use.

The frivolous nature of the allegations against COL Westcott is further illustrated by the fact that extensive inquiry by both the Army Criminal Investigation Division ("CID") and the DAIG found that neither MG Baratz nor COL Westcott had committed criminal acts. The DAIG itself concluded that there was no evidence to substantiate the allegation that COL Westcott had violated government ethics laws in his handling of the government contracts at issue here. Left with no substantial evidence of wrongdoing on COL Westcott's part, the DAIG, in its dogged two-year investigative effort, was left to pursue only a flimsy allegation of "negligence"[3] against COL Westcott. As will be shown, this allegation does not stand up to any scrutiny.

---

[2] As discussed in detail below, the DIAG ultimately substantiated allegations that COL Westcott negligently performed his duties as a Contracting Officer's Technical Representative ("COTR"), to the personal and professional benefit of his former commander, MG Max Baratz. COL Westcott, however, never held the title of COTR.

[3] The DAIG never stated what standard it employed in assessing whether COL Westcott acted negligently.

### *COL Westcott's Military Performance History*

As would be expected of an officer who was selected for promotion to Brigadier General, COL Westcott enjoyed a truly exemplary military career for over 32 years. Needless to say, COL Westcott's performance was stellar at every stage of his Army career. COL Westcott earned an unbroken string of perfect Officer Evaluation Reports and accordingly was promoted in a timely manner at all stages of his distinguished career. Especially noteworthy are the numerous comments on COL Westcott's high ethical and moral standards, loyalty to the Army and dedication to "mission first."

As a Lieutenant Colonel in 1991, COL Westcott was described as having "performed all his duties in a flawless manner. …During Operation Desert Shield/Storm, LTC Westcott was instrumental in establishing the USAR methodology which validated selected USAR units. He was responsible to provide on demand analysis and recommendations to the Crisis Action Team ensuring the best possible USAR units were selected and deployed. His exceptional competency and devotion to duty had an immeasurable impact on this agency. Top notch officer in all respects, among the very best within the AGR program. …LTC Westcott has unlimited potential and would be suitable for any assignment in the Department of Defense. ..LTC Bruce Westcott is one of the most competent officers I know. …<u>Mission is always paramount. Portrays the highest of moral standards.</u>" (Emphasis added.) Exhibit 1, OER of August 12, 1991.

During the following rating period, COL Westcott was described as "calm and self-assured in the most tumultuous times. He is forthright and forthcoming in his dealings with others. He can be relied upon to do the right thing when the choices are tough. …LTC Westcott has proven his ability to perform at higher levels of responsibility. …The future of the USAR us dependent on officers like him. …He has demonstrated excellent composure under great stress.

4

LTC Westcott should be selected for senior service college now and be promoted to colonel far ahead of his peers." Exhibit 2, OER of January 4, 1992.

An OER of August 31, 1992 described COL Westcott as "[c]hallenged with one of the most critical and difficult positions in the Army Reserve during this era of force structure reductions and declining resources, he handled his responsibilities extremely professionally. ...This fine officer's potential for promotion and increased responsibility is unlimited. He should be selected to attend SSC and promoted immediately. ...LTC Westcott is a truly exceptional and talented officer, and is among the top percent in the AGR program. His work ethic, depth of force structure and force integration expertise, and communications ability are unparalleled." Exhibit 3.

COL Westcott was similarly rated the following year, described as "the best Force Developer/Integrator ever observed over a nine year period. ...He can organize chaos in minutes and determine where to employ subordinates so that they make their best contribution. ...His leadership during the entire rating period was outstanding. ...This officer thrives on hard work and demanding situations, needs little guidance and supervision and outperforms any Lieutenant Colonel observed. ...LTC Westcott can perform duties at the colonel level now. ...He is an 'operator' in the best sense of the word. He makes things happen and gets things done. ...I would not hesitate to recommend LTC Westcott for positions of the highest responsibility in the USAR." Exhibit 4, OER of March 21, 1993.

In an OER dated September 17, 1993, COL Westcott was described as being "continually tasked to complete complex taskings on an extremely short notice and he has performed these missions better than any officer of his rank within the USAR. LTC Westcott and his team continue to be on the leading edge of strategic future structure planning for the USAR. I know of

5

no other officer who has such strong capabilities, desire or work ethic within the USAR as LTC Westcott. ...LTC Westcott should be groomed for senior positions within the AGR program. Schooling plus promotion at earliest possible time." Exhibit 5. During the following rating period COL Westcott was "key to producing a number of new programs for the Army Reserve. ...He has managed a number of high profile programs from concept to fruition on confirmed time lines. This activity has involved long hours, a heavy travel schedule, and substantive command pressure. LTC Westcott produces a product which is complete, coherent, and relevant. ...LTC Westcott has had to interface at all levels of the Army and manages this with a minimum of friction. He possesses strong interpersonal skills which make his work even more effective. LTC Westcott has done a first class job." Exhibit 6, OER of September 17, 1994.

During 1995, COL Westcott "was a key officer in managing the 'futures' cells within the USAR. He has been responsible for developing, packaging, and selling a number of major Army Reserve innovations. This activity required presentations to the highest levels of America's Army, the Congress of the United States, cross and interstaff coordination and senior leadership in other components of the military establishment. LTC Westcott performed these duties in a brilliant manner. I know of no other officer in the Army who is capable of performing at this sustained level of activity while at the same time achieving the high level results." Exhibit 7, OER of July 23, 1995. While at the Senior Service College, COL Westcott was "noted for his professionalism, intelligence, honesty and confidence. He has a superb knowledge of the Medical Service Corps, Army force structure, and reserve component issues. His outstanding abilities and exceptional professional qualities will make him stand out as a senior leader in the Army of the future." Exhibit 8, SSC Academic Evaluation Report of June 8, 1996.

While serving under BG James R. Helmly, COL Westcott was rated as exhibiting "the highest standards of loyalty, integrity, personal behavior, and conduct. ... COL Westcott has performed his duties and discharged his responsibilities in a diligent, most distinguished manner. ...There is virtually no major action involving the Army Reserve that he has not played a pivotal, decisive role in resolving. He excelled in leading the Army Reserve successfully thru the Quadrennial Defense Review (QDR) and National Defense Panel (NDP) strategy reviews. His list of accomplishments reads like a 'who's who' of critical actions which collectively shape and determine the future of the Army Reserve. ...COL Westcott is an absolute top performer. Totally professional, poised, mature, and dedicated he enjoys the loyalty cooperation, and support of subordinates, superiors, and peers. ...A rising star of unlimited potential, he is a true professional in every sense of the word." Exhibit 9, OER of June 8, 1997. The following year's OER was equally stellar. COL Westcott "continued his brilliant performance during this rating period. Extremely well organized and mission oriented, his broad scope of in-depth knowledge and visionary strategic thinking ability have brought unprecedented success and strength to USAR force planning and force structure programming. ...A poised and mature leader with an authoritative manner, his exceptional performance has materially strengthened the Army Reserve. ...COL Westcott is an absolute top performer in every respect. Promote him to General Officer. Consider strongly for selection as Deputy Chief, Army Reserve." Exhibit 10, OER of May 23, 1998.

While serving under BG Helmly and LTG Thomas J. Plewes, COL Westcott continued to excel in the performance of his demanding duties. He was described as having "clearly and convincingly demonstrated those qualities of strategic leadership necessary to perform at General Officer rank successfully. He has, in fact, been performing at the flag level. Properly selected as

the next Deputy Chief, Army Reserve, he should be selected for promotion to General Officer now." Exhibit 11, OER of May 23, 1999.

As Chief, Army Reserve, LTG Plewes stated that "in his first year as Deputy Chief, Army Reserve, COL Westcott far exceeded my expectations. …As advocate and protector of Army Reserve equities, Colonel Westcott set the standard for current and future Deputies to be measured against. His vast force development and organization design experience coupled with his insights as a strategic planner have earned him respect and credibility throughout Headquarters, Department of the Army, Office of the Secretary of Defense, the Joint Staff, the Department of Defense and with the Congress of the United States. He is an exceptional public speaker and communicator who has earned my total trust and confidence. Promote immediately to Brigadier General, he operates at that level now and has unlimited potential." Exhibit 12, OER of May 23, 2000. His OER for 2001 was equally compelling. COL Westcott was described as "a consummate leader and gifted speaker…recognized throughout the Department of the Army as a subject matter expert not only on all matters regarding the Reserve Components, but also as a Force Design expert for the Army Staff. I rely on his counsel in determining the best course of action on matters of the greatest importance to the Army Reserve. …Tenacious, and completely loyal, he always does what is right for the U.S. Army—without fail! Colonel Westcott possesses vast, untapped potential and can perform now at any level of senior leader responsibility in the Army." Exibit 13, OER of May 23, 2001.

During his final year of active duty service, COL Westcott continued to demonstrate the same exceptional technical and leadership abilities that had ensured him a distinguished and highly successful career as an Army officer. COL Westcott was rated as "an officer of unparalleled character and competence. Experienced, mature, technically competent and

intellectually agile, he has contributed immeasurably to the success and reputation of the Army Reserve. …Having earned my complete trust and confidence, he is regularly tasked to defend and advance Army Reserve equities in every venue. Colonel Westcott is a consummate team player, selfless and professional in all respects, the embodiment of Army values." Exhibit 14, OER of May 23, 2002. He was rated in his final OER as "an officer and a gentleman, in word and deed…. His record is replete with testaments to his moral and physical courage, selflessness, sense of duty, honor, and loyalty. He has served his Nation and the Army with distinction." Exhibit 15, OER of December 31, 2002.

As the foregoing demonstrates, COL Westcott was an officer of the highest caliber. His ethical standards and conduct, rather than being questioned, were repeatedly lauded as exemplary. He led by example, treating others with respect and consideration. Intelligence, loyalty, and selfless service to our Nation and the Army were the hallmarks of his distinguished career. Straightforward and uncompromising when necessary, COL Westcott's leadership abilities set the standard for others to follow. His numerous high profile accomplishments will continue to bear fruit for our national defense for many years to come.

### Statement of Facts

While serving as Division Chief, Office of the Chief of the Army Reserve ("OCAR"), COL Westcott was advised by a subordinate officer that MAJ Michael D. Brown, USAR, had been counseled regarding his unprofessional conduct toward an enlisted woman, SFC Morocco. Because of the seriousness of the allegations involved, COL Westcott requested that the Deputy Chief, Army Reserve ("DCAR"), then Brigadier General Ron Helmley, initiate an informal

investigation under Army Regulation ("AR") 15-6 to determine the facts of the matter. The investigation was completed on June 12, 1998 and submitted to the DCAR. As a result of the investigation, the DCAR placed a Letter of Reprimand ("LOR") in MAJ Brown's Official Military Personnel File ("OMPF"). COL Westcott served as MAJ Brown's Senior Rater for an Officer Effectiveness Report ("OER") covering the period of April 1, 1998 through November 30, 1998, the period during which the AR 15-6 investigation was undertaken and completed. COL Westcott signed the OER on April 23, 1999, recommending that MAJ Brown "be removed from active duty status as soon as possible." Exhibit 16. As a result of the LOR and the negative OER, MAJ Brown complained to the Department of Defense Inspector General ("DODIG"), alleging that COL Westcott had violated provisions of the Whistleblower Protection Act. The DODIG initiated an investigation into the matter. By letter dated November 15, 1999, the DODIG informed COL Westcott that the investigation failed to substantiate the allegations, and that the Army's actions taken against MAJ Brown were justified. Exhibit 17, DODIG Letter of November 15, 1999.

On May 27, 1999, the Army Chief of Staff announced that COL Westcott had been selected for promotion to Brigadier General. This joyous occasion was, however, short-lived, as the Army informed COL Westcott shortly thereafter that a complaint had been filed on June 1, 1999 with the DODIG, alleging that COL Westcott and another senior Army officer within OCAR, notably MG Max Baratz, had engaged in misconduct in the execution of their duties. The hotline call was referred to the DAIG and Army Criminal Investigation Division ("CID") for appropriate action. Through documents obtained under the Freedom of Information Act ("FOIA"), COL Westcott learned that MAJ Brown was the person who made the anonymous DODIG complaint, which ultimately led to the CID and DAIG investigations.

### *The CID Investigation*

The CID began an extensive investigation into the allegations against MG Baratz during the summer of 1999. Importantly, the CID identified COL Westcott as a witness in the investigation, not as subject. Rather, the focus of the investigation was COL Westcott's former rater, MG Baratz. The allegations giving rise to the investigation were that MG Baratz had violated government ethics laws during and after his tenure as Chief, Army Reserve.

Because the CID assured COL Westcott that he was not a subject of their investigation, COL Westcott agreed to cooperate fully with the investigators. COL Westcott was never "titled" by the CID, a fact demonstrating that he was not a subject or suspect in their investigation. On October 8, 1999 and October 21, 1999, COL Westcott submitted to extensive questioning by the CID investigators. When the CID completed its investigation, the matter was referred to the Office of the United States Attorney for possible criminal prosecution. On two occasions the U.S. Attorney's Office subpoenaed COL Westcott to testify before a federal grand jury. As with the CID investigators, the U.S. Attorney's Office assured COL Westcott, through his military counsel, that he was not a subject of the investigation. Exhibit 18, April 13, 2000 Memorandum of LTC Robert D. Teetsel. COL Westcott complied with the subpoenas, and provided extensive testimony to the members of the grand jury. After hearing all relevant evidence in the case, the grand jury refused to indict MG Baratz.[4]

Because COL Westcott was a key player in the events giving rise to the allegations, it is likely that his testimony, which was truthful and highly detailed, played a primary role in the grand jury's decision to refuse to indict MG Baratz. There can be no doubt that this was a source of frustration for the CID investigators, who had expended considerable time and vast resources

---

[4] A compelling fact, given the ease with which prosecutors obtain federal grand jury indictments.

in getting the case before the grand jury. COL Westcott in fact was informed that the CID investigator, John F. Khin, was greatly chagrined by the ultimate outcome of his investigation. It is highly likely that this played a significant role in the events that followed.

### The DAIG Investigation

While the U.S. Attorney's investigation into the allegations against MG Baratz was underway, COL Wescott's military counsel was informed in March, 2000 that the DAIG was reviewing the case for possible investigative action against COL Westcott for his role in the allegations against MG Baratz. Exhibit 18, April 13, 2000 Memorandum of LTC Robert D. Teetsel. During this time, COL Westcott's military counsel was again told that the focus of the investigation was MG Baratz, not COL Westcott. Because COL Westcott's promotion was being held-up while he was occupying a Brigadier General billet, COL Westcott and his counsel made numerous attempts to clarify the status of the DAIG's concerns and to expedite an investigation if one were to be undertaken. On two subsequent occasions, COL Westcott's military counsel made further inquiries with the DAIG, beseeching them to expedite their investigation of COL Westcott, if an investigation were to take place at all. These efforts, however, proved fruitless. In a letter dated October 31, 2000, LTC Scott L. Kilgore, Area Defense Counsel, stated that:

> your office informed me [in response to a memorandum of August 11, 2000] that it would conduct a preliminary inquiry (PI) into the credibility of the allegations against COL Westcott. Now, almost three months later, I have learned that the PI is just getting underway. ...No installation commander would tolerate such a lethargic investigation from his or her officers (or NCOs for that matter!). Yet, the DAIG continues to plod along. No soldier should endure the unending purgatory that befalls those who are the target of DAIG complaints. Anything you can do to expedite the DAIG review of COL Westcott's case is sincerely appreciated. Exhibit 19, Memorandum of October 31, 2000.

Over three months later, on February 7, 2001, the DAIG issued a Directive for Investigation authorizing investigators to conduct an inquiry into allegations involving COL Westcott. The Directive stated that "[o]n 9 March 2000, CID referred COL Westcott's allegations to DAIG for appropriate action. On 22 March 2000, CID informed DAIG that their investigation did not establish any evidence of criminal wrongdoing on the part of COL Westcott." Exhibit 20, Directive for Investigation—ACTION MEMORANDUM.

The DAIG did determine that two allegations warranted further investigation: 1) whether COL Westcott performed his duties as a contracting officer's representative in a negligent manner; and 2) whether COL Westcott violated standards of ethical conduct in contracting and related activities pertaining to a private corporation that engaged in defense contracting. The DAIG investigation ultimately substantiated only the first of these two allegations. As discussed in detail below, however, the DAIG did so through an investigative process plagued by gross procedural error and the distortion and misunderstanding of basic facts.

### Procedural Aspects of the DAIG Investigation

As noted, in March, 2000 COL Westcott first learned that the DAIG was considering an investigation into his role in the allegations against MG Baratz. During the entire time the DAIG was undertaking a preliminary investigation of COL Westcott's involvement in the matters giving rise to the CID investigation into MG Baratz, the DAIG did not, either in response to queries by COL Westcott's military attorneys, or of its own accord, advise COL Westcott of the grounds for the preliminary investigation.

COL Westcott was notified by telephone that the DAIG had completed its preliminary investigation and that a full DAIG investigation was to be undertaken. At no time prior to his interview with DAIG investigators was COL Westcott informed in writing or orally of the scope

of the investigation or of the specific allegations forming the basis of the investigation. Only on April 23, 2001, when COL Westcott was interviewed in great detail for six hours by the DAIG investigators, was he apprised of the allegations against him, but even then only in vague terms. At the beginning of the interview, the interviewer advised COL Westcott as follows:

> You are advised that you are suspected of the following allegations, which we want to question you about: that you performed your duties as a COTR in a negligent manner and violated standards of ethical conduct in contracting and related activities pertaining to SY Technology, Incorporated. Exhibit 21, Transcript of Interview, at p. 1.

The investigator proceeded to question COL Westcott on a wide range of subjects, and with great precision, reflecting the time and care with which the investigator had prepared for the interview. The questioning required COL Westcott to recall minute details of events that transpired years prior. Any shortcomings or inconsistencies in his responses, of course, would be the subject of exacting scrutiny by the DAIG. The interview lasted some 6 hours, and generated 83 pages of typed transcript.

Because COL Westcott was not advised of the scope of the investigation nor the specific allegations against him during the many months leading up to his interview with the DAIG, he was limited to an entirely responsive role in the investigation. COL Westcott and his military attorneys were unable to anticipate the questions put to COL Westcott in the interview, and therefore were unable to prepare for the interview except in the most general manner. They were unable to conduct an independent investigation into the specific allegations, identify relevant witnesses for the DAIG to interview, and where necessary obtain their testimony independently. Rather, COL Westcott and his military attorneys were required to "sit back and wait" for the

DAIG to provide them details of the allegations. And as noted, this did not occur until COL Westcott's interview, and then only in a general manner.

Thus, COL Westcott was given no notice of the allegations against him. He was given no notice of the identity of the witnesses who provided evidence to the DAIG. He was given no opportunity to contact and interview those witnesses. In effect, he was given no opportunity to prepare his own defense. As discussed in detail below, the inquisitorial nature of the DAIG investigation made a mockery of COL Westcott's procedural rights, which exist not only to protect him against arbitrary and capricious government action, but also to ensure that the investigation is as accurate as possible. A 6-hour interview based on no advance notice of the allegations or the content of the interview cannot, under any system of justice, be considered an adequate opportunity for the development and presentation of the subject's defense.

### Scope and Quality of the DAIG Investigation

Many months after the DAIG concluded its investigation, and only in response to Freedom of Information Act and Privacy Act requests, COL Westcott was provided with a highly-redacted copy of the DAIG Report of Investigation ("ROI"). In numerous instances, entire pages of the ROI were redacted, making it extremely difficult for COL Westcott to assess the integrity of the investigative process and the bases for the investigative findings. The Exhibit List, at p. 78 of the ROI, indicates that the DAIG relied heavily on transcripts of testimony provided by witnesses to CID investigators. The ROI specifies 17 instances in which the investigators relied on transcripts of CID testimony. COL Westcott has never been advised of the identities of these witnesses, nor has he been provided with transcripts of their testimony. In addition to COL Wescott's own testimony, the ROI contains redacted transcripts of DAIG interviews with three witnesses. While COL Westcott may correctly guess the identities of these

three witnesses, in effect he was stripped of his promotion to Brigadier General based on unknown testimony provided by unknown witnesses.

### The Letter of Reprimand

After the investigation was completed, the ROI was forwarded to General John M. Keane, the Army Vice Chief of Staff, who approved the report on July 9, 2001. The ROI substantiated one of the two allegations against COL Wescott: that he had negligently performed his duties as a contracting officer's technical representative ("COTR"). On October 19, 2001, General Keane issued COL Westcott a LOR based solely on the findings of the ROI. The LOR was not accompanied by any of the documents on which the allegations were based, nor did it specify those documents in a separate listing, as required by Army regulations. Moreover, the LOR did not state that COL Westcott had enjoyed an opportunity to review those documents on a previous occasion.

In his response to the LOR, COL Westcott forcefully rebutted the allegations. Exhibit 22. His rebuttal included sworn statements from numerous individuals familiar with the case, including MG Baratz. Mark J. Lumer, Contracting Executive and Principle Assistant Responsible for Contracting for the U.S. Army Space and Missile Defense Command, reviewed the complete file for the contract that formed the basis of the allegations, and concluded that there was no evidence whatsoever of any wrongdoing on COL Westcott's part. Importantly, Mr. Lumer noted that he had not met COL Westcott, and therefore was in a position to provide an objective and impartial assessment of the matter. According to Mr. Lumer:

> I have found no evidence of any improper conduct on your part, nor even the appearance of improper conduct. ...I am bewildered by any accusation to the contrary—there's just no evidence at all of any impropriety. (Emphasis added.) Exhibit 23, Statement of Mark. J. Lumer.

Despite this and other compelling evidence of COL Westcott's innocence, General Keane approved the LOR for placement in COL Westcott's OMPF.

### The Substantiated Allegation

As noted, the DAIG investigation substantiated the allegation that COL Westcott acted negligently in the performance of his duties as Contracting Officer Technical Representative ("COTR"). Background information is required in order to understand the circumstances surrounding this allegation.

While serving as Chief of Operations, Readiness, Training, and Force Development Directorate, U.S. Army Reserve, COL Westcott was directed by his Commanding General, MG Max Baratz, to pursue an Army Reserve force integration support agreement with a company that was reputable in the experience of the Active Army, and, ideally, one that already was being used by the Active Army to support their own force management processes. As COL Westcott has noted, MG Baratz' initiative was based largely on the significant involvement of contractors in support of Headquarters, Department of the Army, during Total Army Analysis ("TAA") 05, the Quadrennial Defense Review, the Reserve Component Offsite, and other major force initiatives.

Based on the direction of MG Baratz, COL Westcott met with COL Steven Cook, the Active Army's leader for Force Development. COL Cook identified a particular private company, SY Tech, as being the sole provider of contractor support for the Total Army Analysis 05 planning and execution function of his Program Branch. COL Cook also expressed strong satisfaction with the results of SY Tech's efforts. At that time, COL Westcott had no knowledge of SY Tech and no previous contact with any of the company's employees.

Based on the Active Army's recommendation, COL Westcott met with SY Tech officials in late July, 1997 to discuss the prospect of their providing support for MG Baratz' initiatives with the Army Reserve. COL Westcott was favorably impressed with SY Tech, and recommended the company to MG Baratz, who further directed that COL Westcott pursue contractual relations with SY Technology. COL Westcott then sought and obtained advice on the contracting process with Active Army officials. COL Wescott was advised that the immediate contractor support that MG Baratz desired was available only by the addition of a "task order" to an existing contract between SY Tech and the U.S. Army Space Command that had been competitively awarded by the Army. The Active Army was at the time using this contract for fundamentally the same services.

After coordinating with Mr. Max Delgado, Contracting Officer ("COR") with the Army Space Command, the Office of the Chief, Army Reserve ("OCAR") submitted a task order in September, 1997 to the Army Space Command delineating SY Tech support requirements. SY Tech was tasked to "support the horizontal and vertical integration necessary to satisfy the Chief, Army Reserve's missions, goals and objectives in the force management area...." Army Space Command then submitted the task order to SY Tech, which prepared a Task Order Plan ("TOP") designed to achieve the stated objectives.

COL Westcott, as the main point-of-contact at OCAR for the SY Tech project, approved the TOP. Expenditures for the effort were then authorized by General Baratz to cover the period of September 1997 through September 1998. Mr. Max Delgado was the COR for the project. As such, it was his duty to ensure that the task order was executed in compliance with applicable rules and regulations. COL Westcott was never designated as either COR or Contracting

Officer's Technical Representative ("COTR") for this project, a vital point that is addressed in detail below.

In May, 1998, General Baratz retired from his post as Chief, Army Reserve, and in July, 1998 began employment SY Technology. The allegations that formed the basis of the DAIG investigation pertained to MG Baratz' subsequent employment with SY Tech and his involvement with ongoing initiatives of the new Chief, Army Reserve. After a six month formal investigation, the DAIG substantiated three specific findings of fact against COL Westcott: 1) he helped obtain a task order for SY Technology that ultimately benefited MG Baratz after he began employment with that company; 2) he was negligent in the performance of his duties because he failed to discuss in a quarterly evaluation a Senior Leadership Training Program involving SY Tech and MG Baratz; and 3) he allowed SY Tech to draft its own performance appraisals, thereby compromising the integrity of the awards fee board system.

### Withholding of COL Westcott's Name From the BG Promotion List

On May 25, 1999, the Army announced that COL Westcott had been selected to serve as Deputy Chief, Army Reserve, a Brigadier General billet. Exhibit 24. On June 29, 1999, COL Westcott was considered for promotion by the June, 1999 U.S. Army Reserve General Officer Promotion Selection Board, and was selected for promotion to the rank of Brigadier General. On July 22, 1999, the DAIG recommended that the allegations against COL Westcott and MG Baratz be referred to a preliminary inquiry. On August 16, 1999 the DAIG recommended that the allegations against COL Westcott and MG Baratz be referred to the Army CID for investigation. The CID initiated its investigation during the summer of 1998. The CID, however, did not specify COL Westcott as a subject of its investigation. In fact, they made clear to COL Westcott and his counsel that he only was considered a witness.

On September 22, 1999, the Secretary of the Army forwarded the results of the promotion selection board to the U.S. Senate for confirmation. The Secretary, however, withheld COL Westcott's nomination as a result of the filing of a DODIG complaint on June 1, 1999. At the time the Secretary withheld COL Westcott's name from the promotion selection list, COL Westcott was not specified as the subject of any investigation, whether conducted by the DAIG or the CID. On November 5, 1999, the Senate confirmed the remaining officers on the promotion selection list. On February 7, 2001, after the CID had failed to secure an indictment against MG Baratz, the DAIG requested and obtained a directive for investigation, under which COL Westcott was specified as the primary subject. Exhibit 25.

### *Errors and Injustices*

### I. The Army Violated Col Westcott's Procedural Rights Under AR 20-1 By Failing To Inform Him Of The Allegations Against Him In A Timely Manner.

AR 20-1, Paragraph 7-6, establishes the policy that an individual who is the subject of investigation shall be afforded an opportunity to comment on any unfavorable information generated as a result of the investigation. Paragraph 7-6 specifically provides that "[i]f the individual <u>was not informed of the unfavorable information during the IG investigation, the IG will advise the person concerned, orally or in writing, of its substance before the IG investigation is completed</u>." (Emphasis added.) The Department of Defense Inspector General has concluded that the regulation clearly requires notice and response during the course of an investigation where the adverse information is to be included in the ROI. The Inquiries and Investigations Guide is equally explicit. That document provides, at Chapter II, Paragraph 2(a)1, that:

> individuals about whom you have developed unfavorable information <u>and will include that information in your report</u>, have the right to know the information and the right to have the

opportunity to comment on it should they so desire. (Emphasis added.) Exhibit, at p. 9.

AR 20-1 was recently revised and republished, and explicitly addresses the investigator's duty to disclose unfavorable information. Paragraph 8-6 provides that:

> [t]he individual has a right to know of the unfavorable information during the IG inquiry or investigation. The IG will orally notify the person concerned (notification) of the allegations and interview the subject or suspect before the IG inquiry or investigation is completed. The IG will provide the person an opportunity to comment on the unfavorable information during the interview process. (Emphasis added.)

Moreover, a subject of a DAIG investigation against whom adverse action is taken on the basis of a DAIG ROI has procedural rights beyond the basic notice and response requirements. AR 20-1, Paragraph 3-3(a) provides that:

> [w]hen an IG record is used as the basis for adverse action, the individual concerned may be entitled to additional due process rights that will breach the confidentiality of witnesses and IG opinions, conclusions, and recommendations. Commanders, State AGs, and directing authorities must consider this impact when deciding whether to request the use of an IG record for adverse action. (Emphasis added.)

To fully understand the implications of this provision, it must be considered in light of the general right of the subject of adverse action to timely notice and an opportunity to respond. Most obvious, Paragraph 3-3(a) makes reference to the disclosure of the documents generated in the course of the investigation, to include the ROI itself, the identities of witnesses, and the contents of their sworn statements. Implied in this formulation is the right of the subject of adverse action to review the testimony of witnesses who contributed to the ROI, along with all documents generated or relied on in the course of the investigation. This view is supported by AR 20-1, Paragraph 3-3(a), which clearly places the onus on commanders to weigh the

advantages of basing adverse action on an ROI with the revelation of the details of the investigative process. What is not contemplated is that commanders may "have their cake and eat it too." In other words, they may not base adverse actions on an ROI while simultaneously depriving the subject of the additional procedural rights—access to the ROI and other investigative information—to which he is entitled as a result of the contemplated adverse action.

A subject therefore must be provided notice of unfavorable information and an opportunity to respond to that information. The purpose of these provisions is to ensure that the subject of the investigation is afforded a timely opportunity to refute or otherwise challenge unfavorable information, before the evidentiary value of the unfavorable information is assessed and included in the final ROI. By providing the subject with notice of the specific allegations against him, the subject is thereby able to conduct his own independent investigation of the facts at issue. The subject may identify witnesses, documents and other relevant materials for submission to the investigator, who then is obligated to consider those materials in making his or her findings of fact. *See* AR 20-1, Paragraph 7-2(a)(1)(b). In effect, these provisions confer on the subject the fundamental right to present a defense.

In this case, COL Westcott's right to notice and comment was emasculated by the DAIG's failure to advise COL Westcott of the unfavorable information as it was developed during the course of the investigation. As noted previously, COL Westcott and his military counsel first learned that the DAIG was considering an investigation of COL Wescott in March, 2000. The DAIG never informed COL Westcott of the basis for the potential investigation, despite requests for this information from his military counsel.

The DAIG informed COL Westcott in January, 2001 that a full investigation of allegations against him was to be undertaken. The formal investigation covered a six-month

period, from February 7, 2001 until July 9, 2001. At no time prior to his interview with the DAIG was COL Westcott informed of the allegations against him or the scope of the investigation. Nor did the investigator inform COL Westcott of the specific factual bases on which the allegations were based. Only at the time of his 6-hour interview with the DAIG investigator was COL Wescott advised of the allegations against him, and then only in a cursory manner. At no time during the DAIG's interview with COL Westcott, however, did the investigator inform COL Westcott of the specific facts forming the basis of the allegation of negligence. Exhibit 26, August 14, 2001 Memorandum of LTC Kilgore. Therefore COL Westcott was deprived of an opportunity to comment on them, contrary to Army regulations.

As noted, during the course of the interview the investigator provided COL Westcott only with a general statement of the allegations against him. Such belated disclosure, however, did nothing to advance COL Westcott's right to notice and comment, and cannot under any circumstances be considered an adequate substitute for timely and proper disclosure. This truly was a case of "trial by ambush," an abhorrent practice under our constitutional order.

The failure of the DAIG to advise COL Westcott of the allegations against him, and the factual bases for those allegations, during the course of the investigation deprived COL Westcott of any meaningful opportunity to effectively prepare a defense. The DAIG was able to consider the evidence against COL Westcott for nearly two years prior to the completion of the investigation. During this time the DAIG reviewed numerous documents and transcripts of witness testimony, made independent inquiries of witnesses and agencies, and developed a factually complicated case theory that impugned COL Westcott's conduct. COL Westcott, on the other hand, was left to speculate as to what specific concerns the DAIG had about his conduct, the bases for those concerns, and how he might best respond to them.

Unsurprisingly, the DAIG's failure to properly advise COL Westcott of the allegations caused him severe prejudice. Had he been timely notified of the allegations in a manner consistent with AR 20-1, COL Westcott and his counsel would have been able to undertake their own independent investigation of the allegations. Timely disclosure of the allegations would have placed COL Westcott on more evening footing with the DAIG, rather than leaving him in the untenable position of having to respond to very serious allegations by memory in an impromptu manner during the course of a 6-hour DAIG interview. The right of every accused to defend himself under conditions that are fair is a hallmark of our Nation's system of civilian justice, and it is no less the right of COL Westcott under Army regulations.

**II. The Army Violated Col Westcott's Procedural Rights Under AR 600-37.**

The filing of a LOR in an officer's Official Military Performance File ("OMPF") is an extremely serious personnel action with profound consequences for the affected officer's career. In most instances, a LOR will prevent an officer from being promoted, and may lead to early separation from the military. Mindful of this fact, and of the potential for inappropriate use of adverse information by commanders and others, the Army has promulgated regulations conferring on the affected officer the right to review and respond to the evidence upon which a LOR is based, prior to its filing in the OMPF.

Army policy on the inclusion of such unfavorable information in an officer's OMPF is stated clearly in AR 600-37, Paragraph 3-2(a) as follows:

> [e]xcept as indicated in paragraph 3-3, unfavorable information will not be included in an official personnel file unless the recipient has been given the chance to review the documentation that serves as the basis for the proposed filing and make a written statement, or to decline, in writing, to make such a statement. (Emphasis added.)

As regards letters of reprimand, Paragraph 3-4(b)(1) provides that a letter that is intended to be included in a soldier's OMPF will "[b]e referred to the recipient concerned for comment according to paragraph 3-6...." Paragraph 3-4(b)(1)(a) further provides that:

> [t]his referral will also <u>include and list applicable portions of investigations, reports and other documents that serve, in part or in whole, as the basis for the letter,</u> providing the recipient was not previously provided an opportunity to respond to information reflected in that documentation." (Emphasis added.)

AR 600-37 thus creates an independent right of notice and response for the affected officer. The officer is to be provided, prior to exercising his right of rebuttal, and prior to the placing of the LOR in his OMPF, with all documents upon which the allegations forming the basis of the LOR are contained. Self-evidently, the purpose of this procedural safeguard is to afford the affected officer full opportunity to defend himself against the allegations prior to the final approval of the LOR and its conclusion in the officer's OMPF. As noted in the previous section, the provisions of AR 20-1 expand the fundamental right of notice and response where the ROI forms the basis of the adverse action against the officer.

In this case, the Army violated COL Westcott's procedural rights by providing him only with a highly redacted copy of the DAIG ROI, and then only after repeated requests under the Freedom of Information Act and the Privacy Act. In some instances the ROI is so extensively redacted that it was useless to COL Westcott and his attorneys. Moreover, none of the witnesses who provided testimony to the DAIG were identified. Thus, COL Westcott was required to rebut the proposed LOR based on extremely limited documentation, severely curtailing his ability to respond to the allegations in an effective manner. As with the DAIG investigation and the ROI, the LOR was issued under procedures that violate Army regulations and offend basic principles of fundamental fairness.

Moreover, General Keane violated the letter of AR 600-37 by failing to include and list with the LOR the documents, reports, and other information upon which the LOR was based, as required by paragraph 3-4(b)(1)(a). This provision serves as a safeguard to ensure that where, as in this case, the officer has not had an opportunity to review the documents upon which the LOR is based, he is afforded a reasonable opportunity to do so prior to the submission of a rebuttal. COL Westcott's ability to defend himself against the LOR was further undermined by the Army's failure to adhere to AR 20-1. Because the DAIG ROI provided the sole basis for the LOR, COL Westcott was entitled to disclosure not only of an unredacted copy of the ROI and all documents relied on during the investigation, but also of the names and testimony of those witnesses whose evidence was relied on by the DAIG.

As noted previously, however, here COL Westcott never enjoyed an opportunity to interview or simply review the testimony of those witnesses. In reality, his career was destroyed, and his otherwise stellar reputation severely tarnished, by unknown information provided by unknown witnesses. To say under such circumstances that COL Westcott was afforded a fair opportunity to defend himself is to mock the concept of justice itself.

### III. The Army Failed To Resolve Col Westcott's Promotion Status Within The 18-Month Time Period Specified By 10 U.S.C. § 14311 And AR 600-8-29.

10 U.S.C. § 14311 provides the congressional authority for the promotion of reserve military officers. Under this provision, the promotion status of an officer whose promotion has been lawfully delayed must be resolved within a period of 18 months from the date when the officer would otherwise have been promoted. According to paragraph (d) of section 14311:

> [t]he appointment of an officer to a higher grade may not be delayed under subsection (a) or (b) for more than six months after the date on which the officer otherwise would have been promoted unless the Secretary concerned specifies a further period of delay.

> An officer's appointment may not be delayed more than 90 days
> after final action has been taken in any criminal case against such
> officer in a Federal or State court of competent jurisdiction or more
> than 90 days after final action has been taken in any court-martial
> case against such officer. <u>Except for court action, a promotion may
> not be delayed more than 18 months after the date on which such
> officer would otherwise have been appointed.</u> (Emphasis added.)

This provision is applicable to officers, such as COL Westcott, whose promotions have

been delayed on the grounds that "an investigation is being conducted to determine whether any

disciplinary action of any kind should be brought against the officer...." 10 U.S.C. §

14311(a)(1)(A). No general exception is provided for the 18-month time limit.

Federal courts have construed this time provision strictly. In *Rolader v. U.S.*, 42 Fed. Cl.

782 (Ct. of Fed. Claims 1999), the United States Court of Federal Claims held that an officer was

deemed to be promoted "by operation of law" where the 18 month time limit had passed. In other

words, once the 18 month time period had run, the officer was deemed to have been

automatically promoted by operation of 10 U.S.C. § 624(d)(4), which parallels the provisions of

10 U.S.C. § 14311. *Also see Barnes v. United States*, 57 Fed. Cl. 204 (2003).

The court in *Rolader* also considered the interaction between 10 U.S.C. § 624(d)(4) and

10 U.S.C. § 629(a), which authorizes the President of the United States to remove an officer

from the promotion list. That provision provides that "[t]he President may remove the name of

any officer from a list of officers recommended for promotion by a selection board convened

under this chapter." Importantly, the court noted that the Army "construe[s] sections 624 and 629

as operating in tandem, so that the eighteen month outer limit on delay precludes removal of a

name after that point." *Rolader*, at p. 786.    The pertinent U.S. Army regulation closely follows

10 U.S.C. § 14311. Paragraph 1-20(b) of AR 600-8-29 provides that [a]n officer's promotion

will not be delayed more than 6 months unless the [Secretary of the Army] or the Secretary's designee grants a further delay."

Paragraph 1-20(b) also provides that a further period of delay:

> is deemed to have been granted in any case that has been referred to a promotion review board; the delay in such cases extends until the [Secretary of the Army] takes final action. In no case may an officer's promotion be delayed more than 90 days after final action in any court martial or criminal case against the officer in Federal or State court, or more than 18 months after the date on which the officer would otherwise have been appointed, whichever is later. (Emphasis added.)

In this case, COL Westcott was selected for promotion to Brigadier General on June 29, 1999. Exhibit 27. COL Westcott was scheduled to be promoted on or around November 5, 1999. Effective September 22, 1999, however, the Secretary of the Army withheld COL Westcott's name from the promotion list pending completion of the DAIG investigation. Exhibit 28. On July 15, 2002, the Army advised COL Westcott that he was being referred to a Promotion Review Board for a recommendation of retention or removal from the June 1999 Army Reserve General Officer Promotion Selection List. Exhibit 29. On the same day, COL Westcott submitted a request for Voluntary Retirement. COL Westcott retired from Army service on February 1, 2003.

Thus, the Army failed to resolve COL Westcott's promotion status within the required 18-month period of time. According to 10 U.S.C. § 14311, COL Wesctott's promotion status should have been fully resolved on or around May 5, 2001. Because 10 U.S.C. § 14311 does not provide for any exception to the 18-month time limit, this Board must deem COL Westcott to have been promoted by operation of law, effective on or around November 5, 1999.

**IV. The Army Violated 10 U.S.C. § 14311 And AR 600-8-29 By Failing To Notify Col Westcott In Writing Of Its Decision To Delay His Promotion And Provide Him An Opportunity To Respond In Writing To The Secretary Of The Army.**

10 U.S.C. § 14311, paragraph (c)(1) provides that "[t]he appointment of an officer to a higher grade may not be delayed under subsection (a) or (b) unless the officer is given written notice of the grounds for the delay." Paragraph (c)(2) further provides that "[a]n officer whose promotion is delayed under subsection (a) or (b) shall be given an opportunity to make a written statement to the Secretary of the military department concerned in response to the action taken. The Secretary shall give consideration to any such statement."

AR 600-8-29, paragraph 1-20, is responsive to the Congressional requirements of 10 U.S.C. § 14311, and provides that "[t]he office preparing the DA Form 268 [Report to Suspend Favorable Personnel Actions (Flag)] must give that officer written notice of the reason for the delay of promotion before its imposition or as soon thereafter as possible.... An officer whose promotion has been delayed may make a written statement, expeditiously forwarded through the chain of command, to the Secretary of the Army...."

The purpose of these provisions is to give the affected officer advance notice of the impending delay in promotion and afford the officer an opportunity to make representations as to why such action is unwarranted or otherwise inappropriate. These provisions therefore create an important procedural safeguard to prevent the surreptitious or otherwise unjustifiable delay of an officer's promotion.

In this case, however, the Army violated 10 U.S.C. § 14311 and AR 600-8-29 by failing to notify COL Westcott in writing of the grounds for the delay and afford him an opportunity to respond. COL Westcott was never provided with any such notification. This is confirmed by the fact that the Army Reserve, in response to COL Westcott's FOIA request, stated that "[w]e have

conducted a thorough search in our organization, and no records were found [pertaining to the Army's decision to delay COL Westcott's promotion]." Exhibit 30.   The Army likewise provided COL Westcott no documents indicating that it had provided COL Westcott such notification. Exhibit 31, July 15, 2003 Response to FOIA/PA Request.

This error severely prejudiced COL Westcott by depriving him of an opportunity to clarify his involvement in the contracting process at a point where he might have avoided the humiliation and losses associated with his promotion delay. Moreover, this would have given COL Westcott clear notice that his conduct was under serious scrutiny and therefore he could have began preparing a defensive response to the allegations at a much earlier stage. However, because he was not notified of the promotion delay and the bases therefore, more than one year would pass before COL Westcott would learn even the basics of the allegations against him.

The Army's conduct in this regard is highly disturbing. It is astonishing that an officer's promotion to Brigadier General could be delayed at the eleventh hour without the officer even being notified that delay was being contemplated. The experience was profoundly humiliating to COL Westcott, who had announced his promotion to his family, friends, and colleagues, and was planning his life based on the sound assumption that he in fact would be promoted. To be informed after the fact that the promotion had been withheld, without enjoying any opportunity to comment, was not merely unlawful, it was contrary to core Army values and basic precepts of human decency.

### V. The Army Had No Basis Under 10 U.S.C. § 14311 Or AR 600-8-29 For Delaying Col Westcott's Promotion.

10 U.S.C. § 14311, paragraph (a)(1)-(c) provides that "the appointment of an officer to a higher grade may be delayed if ... an investigation is being conducted to determine whether

disciplinary action of any kind should be brought against the officer." AR 20-1,[5] "Inspector General Activities and Procedures," outlines the process for handling an anonymous IG complaint such as that made against COL Westcott. According to Chapter 4, Paragraph 4-1, "Inspectors general will use the Inspector General Action Process (IGAP) outlined below in receiving and resolving IGARs [Inspector General Action Requests]." Where the complaint is received through the DODIG Hotline, as occurred here, "[t]he coordinator refers DOD Hotline cases to field IG offices for appropriate action and reply...." *See* Paragraph 4-2(g)(4). Once the proper IG office has received the complaint, the Inspector General Preliminary Analysis ("IGPA") process is employed to determine the correct disposition of the case.

Paragraph 4-3(c) provides that "[a]n IG is usually in IGPA until a course of action is selected for a particular issue or allegation, but in the course of obtaining facts, additional issues may result in further IGPA concurrent with other IGPA procedures pertaining to the original IGAR." (Emphasis added.) During the IGPA, the IG is directed to identify allegations and issues and determine the appropriateness of the complaint for IG action. Once the analysis is completed, and the IG determines that a formal IG investigation is warranted, the IG must then obtain a directive for investigation from the Vice Chief of Staff. If the IG determines that an Investigative Inquiry is sufficient to address the matter, no Directive for Investigation is required.

As noted previously, on June 1, 1999 the DAIG received an anonymous complaint alleging misconduct on the part of three officers, including COL Westcott. On July 22, 1999, the DAIG recommended that the allegations against COL Westcott and MG Baratz be referred to a preliminary inquiry. If conducted at all, the preliminary inquiry was undertaken between July 22,

---

5 Of 16 April 2001. This process, though in existence, was not detailed in AR 20-1 of 15 March 1994, which was effective at the time the DAIG investigation of COL Westcott was

1999 and August 16, 1999, on which date the DAIG recommended that the allegations against MG Baratz and COL Westcott be referred to the Army CID. As noted, the CID did not identify COL Westcott as a subject or suspect of its investigation. On February 7, 2001, the DAIG requested and obtained a directive for investigation to "conduct an inspector general investigation" into COL Westcott's role in the allegations against MG Baratz. The Secretary of the Army withheld COL Westcott's name from the promotion selection list on September 22, 1999.

From the inception of its investigation of MG Baratz, the CID identified COL Westcott as a witness to the investigation, not a suspect. Both the DAIG and the CID repeatedly assured COL Westcott and his military counsel of this fact. As noted previously, COL Westcott on several occasions provided sworn testimony to the CID and the Federal Grand Jury that was convened to considered federal criminal charges against MG Baratz. Exhibit 32, June 13, 2000 and July 11, 2000 Subpoenas to COL Westcott. Moreover, COL Westcott's status as a witness and not a subject or suspect is further evidenced by the fact that he was never "Titled" by the CID during its investigation, as would have been required under DOD Instruction 5505.7. The CID's sole function is investigating allegations of criminal conduct. It therefore would be erroneous to conclude that the CID investigation was geared toward determining whether disciplinary action of any sort should be taken against COL Westcott.

In reality, it was not until February 7, 2001, when the DAIG obtained a Directive for Investigation, the requisite authority for conducting a DAIG investigation, that COL Westcott became the subject of an investigation geared toward determining whether "whether disciplinary

---

commenced.

action of any kind should be brought against the officer." Moreover, at no time prior to that date, and in no manner, did the DAIG advise COL Westcott that he was the subject of investigation.

Thus, at the time the Secretary of the Army directed COL Westcott's removal from the Brigadier General Promotion List on September 22, 1999, COL Westcott was not the subject of an investigation satisfying the requirements of 10 U.S.C. § 14311 and AR 600-8-29. As noted, the CID repeatedly informed COL Westcott that he was not the subject of any such action. Furthermore, although the DAIG apparently had initiated a "preliminary inquiry" into the allegations against COL Westcott, such inquiry was completed prior to the Secretary of the Army's removal of COL Westcott from the promotion list. COL Westcott was, therefore, in fully promotable status at the time the Secretary of the Army delayed his promotion. As such, the delay was unlawful.

### VI. The Evidence Does Not Demonstrate by a Preponderance of the Evidence that COL Westcott Acted "Negligently" in the Performance of His Duties.

In order to find that an allegation is substantiated, the DAIG must demonstrate that the preponderance of the evidence supports the factual claims underpinning it. AR 20-1, Paragraph 7-2(a)(1)(b). The allegation here was that COL Westcott had performed his duties as COTR in a "negligent" manner. As will be demonstrated below, the evidence presented by the DAIG was plagued with factual error, gross overstatement, and the use of unfounded inference. When understood in its proper context, it is apparent that the evidence relied on by the DAIG and General Keane does not meet the preponderance standard, and therefore no lawful basis existed for substantiating the allegation of negligence.

It is self-evident that a LOR must be based on credible facts if it is to be lawful. Where a LOR recites or is based on information that is incorrect, the LOR must be deemed void, and all

associated adverse actions must be nullified. From a legal and policy standpoint, it is intolerable that an officer's career could be undermined by a LOR that was negligently prepared. This would constitute a gross miscarriage of justice. Unfortunately, that is exactly what transpired in this case.

Here, COL Westcott does not allege that General Keane prepared the LOR with malicious intent. He does demonstrate, however, that the central facts upon which the LOR was based are erroneous and that General Keane therefore was negligent in his duty to ensure that the LOR was based on sound findings of fact and therefore was an accurate reflection of reality. Because the LOR was based on factual error, it should be voided, and COL Westcott's record should be corrected to reflect this fact.

Three findings of fact adverse to COL Westcott were developed by the DAIG, and formed the sole basis for the LOR placed in COL Westcott's OMPF. Each of the findings of fact, two explicitly so, are underpinned by the inference that COL Westcott should have had knowledge of particular facts and events because of COL Westcott's relationship to MG Baratz. The presumption underlying the inference is that COL Westcott's relationship with MG Baratz was personal to the point of being improper, and improper to the degree that COL Westcott would place MG Baratz' personal financial interests above the interests of the Army. In effect, the presumption is that COL Westcott would collaborate with MG Baratz to provide him with personal gain at the expense of the Army, and therefore the American taxpayer. As demonstrated below, this presumption was preposterous and wholly unsupported by fact.

### *Negligence Performance of Duties as a COTR*

The DAIG investigation found that COL Westcott acted negligently in the performance of his duties as COTR on Task Orders ("TO") involving services by SY Tech. This assertion was repeated in the LOR prepared by General Keane, which observed that "[y]our performance as a COTR fell far short of [the required standard of performance]. Moreover, your failure to perform your COTR duties properly <u>may have resulted in the award of fees that did not accurately reflect the contractor's performance</u> and created a perception of impropriety and misdirected loyalty." (Emphasis added.) Exhibit 33, Memorandum of Reprimand

In reality, COL Westcott was not designated as COTR on the relevant TOs, nor was he ever instructed in the duties of a COTR or trained in the execution of those duties. Rather, COL Westcott's role in the TOs was limited to that of primary point of contact. The term COTR was restricted to individuals who received specific training and had specialized knowledge of government contracting operations. Exhibit 23. In his testimony to the DAIG, COL Westcott stated "[i]n terms of training for me specifically, they provided nothing, formal or informal. In terms of being assigned in writing, I have—as of today, I still have not been assigned in writing as a COTR or TOR for that matter." ROI, Exhibit B, at 6.

This fact was confirmed by noted military contracting expert Mark J. Lumer, Principal Assistant for Contracting, U.S. Army Space and Missile Defense Command, who stated:

> I must advise you that you were never a COR under this contract, since all CORs must be appointed in writing by a contracting officer and there is no evidence in the official file that you were ever designated as such. You were also referred to as a 'technical monitor' in some documents. I must advise you that you were never a technical monitor either, since, again, there is no formal letter of appointment signed by a contracting officer designating you as such. <u>About the most I can attribute to you pursuant to this contract is that you were a customer and a receiver of the services</u>

> procured—you had no official standing whatsoever. It is possible
> that you were designated a technical representative by Max
> Delgado, but the official contract file contains no evidence of that
> appointment either. (Emphasis added.)  Exhibit 23.

While COL Westcott did refer to himself as COTR on prior occasions, he did so only because COTR was a term of art within Army Reserve contracting circles and its meaning was not clear to him at the time. Exhibit 22. Because he did so, however, does not mean that he can be held to the standard of care exercised by a true COTR who has received the training and possesses the skill corresponding to that title. It is one thing for the law to hold a professional who represents himself as a specialist to the standard of care required of such a specialist, but it is quite another to do so where an individual employs a term that is used colloquially and incorrectly in the local shop parlance.

Rather, as Mr. Lumer intimated, COL Westcott should only be held to the standard of care required of a "customer and receiver of the services procured." In this regard Mr. Lumer noted that:

> Your advice and recommendations that do exist in the contract file
> are what I would expect to see from the receiver of the services
> contracted for—that the services supplied were acceptable, that the
> costs appeared reasonable to you as a subject matter expert in the
> area of work being obtained under the contract, and that additional
> work or scope needed to be adjusted from time to time for a variety
> of reasons. In summary, you had no authority over the contracting
> effort whatsoever, and you took no action that could be considered
> improper (given your lack of authority you couldn't have done so
> anyway). (Emphasis added.) Exhibit 23.

Thus, both the DAIG and General Keane erred in holding COL Westcott to a standard of care that exceeded his training and the duties he executed. Indeed, it is disturbing that the DAIG investigation did not ultimately clarify COL Westcott's role in the contracting process. This strongly indicates that the DAIG insufficiently investigated the basic facts of the case, and

consequently based its conclusions on erroneous findings. As LTG Thomas J. Plewes noted in his statement on behalf of COL Westcott, "[i]n my mind, the charges that have been substantiated [against COL Westcott] stem from confusion over contracting roles and obligations, not from any attempt to abuse the process." Exhibit 34, April 5, 2002 Statement of LTG Plewes. This opinion is entirely consistent with the available evidence.

### Role in Obtaining $100,000 for a SY Tech TO in the Days Before MG Baratz' Departure

A key allegation cited by General Keane in his LOR was that during the final days of MG Baratz' tenure as Chief, Army Reserve, COL Westcott helped obtain funding for a Task Order (TO# 97-139) that directly benefited MG Baratz once he was employed by SY Tech. According to the LOR:

> [o]nly days before the CAR left active duty, you were instrumental in obtaining approximately $100,000 for a task order to SY Tech for general USARC force development support. Within the first week of the former CAR beginning employment with SY Tech, you were involved in approving a plan and coordinating funding for SY Tech's projected fiscal year contract support that, for the first time, included the senior officer training.

This matter also was addressed by the DAIG in the context of the unsubstantiated allegation against COL Westcott, namely that he had violated ethical standards in government contracting. The DAIG specifically concluded in relation to this allegation that:

> ...further investigation into the details of each transaction failed to demonstrate that COL Westcott had done anything improper. Initial appearances aside, a reasonable person with knowledge of all the facts would not hold a perception that COL Westcott engaged in an impropriety." (Emphasis added.) ROI, at p. 8.

General Keane's primary error was to treat this information as though it were confirmed fact, when in truth the allegation was founded on coincidences wholly unrelated to MG Baratz's employment with SY Tech. In the ROI, the DAIG stated "$364,000 were released from the

CAR's withholding account to fund several TOs initiated by COL Westcott, including TO# 98-246 and TO# 97-139. …[MG Baratz] started his employment with SY Tech in Atlanta on 1 July 1998; the same day TO# 98-246 began. …Evidence established that SY Tech billed [MG Baratz] 176 hours worked in July 1998 under TO# 98-246."

TO# 97-139 was, however, approved and initiated in September, 1997, when MG Baratz was still on active duty, and long before he had accepted employment with SY Tech. In May 1998, around the time MG Baratz retired from the Army, a routine modification to TO# 97-139 was made in order to add two additional employees to the newly reorganized DCOPS and Directorate of Force Programs. The modification responded directly to initiatives approved by the new CAR.

Furthermore, COL Westcott was directed to undertake these actions by the CAR, the Deputy Chief, Army Reserves, and the Director of OCAR Staff. Thus, COL Westcott was simply complying with the dictates of his superior officers. Moreover, as Guy A. Giancarlo, former Comptroller, OCAR, has stated, COL Westcott had no authority over the Senior Leaders Withhold account and could not have authorized the release of funds for these task orders, and did not attempt to direct any funding from that account. Exhibit 35, April 4, 2002 Affidavit of Guy A. Giancarlo. In fact, all funds released required the approval of the CAR. It therefore was grossly irresponsible to suggest that COL Westcott acted of his own initiative and for the purpose of personally benefiting MG Baratz. If the allegations contained in the ROI and LOR were true, they would indicate a broad conspiracy involving LTG Plewes and other senior officers, a most unlikely scenario.

General Keanes further erred in his LOR by linking COL Westcott's role in obtaining funding for TO# 97-139 and TO# 98-246 with the SLTP training ordered by MG Plewes and

38

ultimately coordinated by MG Baratz. On August 3, 1998, MG Baratz met with LTG Plewes during which time he formally proposed that SY Tech conduct the SLTP training for the Army Reserve. Around September 3, 1998, COL Westcott was instructed by LTG Plewes to request a modification to TO# 98-246 to include the SLTP initiative. The replacement TO, #98-262, began on September 21, 1998. On October 21, 1998, LTG Plewes signed a memorandum to the USARC Regional Support Commanders implementing the SLTP initiative. Exhibit 36.

Importantly, the ROI noted that COL Westcott did not participate in any meetings between the Army Reserve and SY Tech regarding the proposed SLTP initiative. Indeed, William T. Lee, the COTR on the TO that contained the SLTP initiative, stated that he never discussed the initiative with COL Westcott and that COL Westcott's name was not associated with the initiative in any manner. Exhibit 37, April 4, 2002 Affidavit of William T. Lee. Likewise, COL Westcott testified before the DAIG that he was not involved in the SLTP initiative to any appreciable degree. The evidence plainly demonstrates that COL Westcott's limited role in obtaining funding for the relevant task orders bore no relationship to the SLTP initiative or MG Baratz' employment with SY Tech.

The disingenuous approach of the DAIG to these matters is illustrated by the highly selective and strategic manner in which it presented the relevant facts. For instance, as evidence of COL Westcott's improper involvement in these task orders and its relationship to SLTP, the ROI stated:

> [o]n 9 July 1998, a SY Tech employee working for COL Westcott in OCAR, wrote an information paper for the CAR outlining fiscal projections for SY Tech's planned contract support to OCAR for the next fiscal year (FY) 1999 (FY99). It projected that SY Tech would provide a 'General Officer Training Program.' This was the first government document that referenced this training. ...Prior to the 9 July 1998 information paper prepared by a SY Tech

39

employee, there was no Government requirement identifying the
need for senior leader training. (Emphasis added.) ROI, at p. 4.

The clear implication gleaned from an uninformed reading of this statement is that COL
Westcott had prior knowledge of the SLTP initiative and had assisted in obtaining funding for
that initiative before it had even been recognized as a government need, and that he had done so
with the knowledge that MG Baratz ultimately would benefit directly from the implementation
of the initiative. Such use of facts by the DAIG was, however, based on half-truths and blatant
distortions, and therefore was grossly misleading.

As COL Westcott discussed at length in his testimony to the same DAIG investigator
who drafted the above statement, the need for training of senior Army Reserve officers in the
functioning and operations of the Regular Army had been discussed among senior Army Reserve
leaders for a number of years prior to MG Baratz' employment with SY Tech. He strongly
emphasized in his testimony that the initiative was not conjured up without reference to
identified Army Reserve needs. The DAIG, however, chose to ignore COL Westcott's testimony,
the facts of which could have been verified by further inquiry of relevant Army Reserve officials.
This is powerful evidence of the biased manner in which the DAIG approached the entire
investigation.

It was equally preposterous for the DAIG and General Keane to suggest that COL
Westcott, as Division Chief, Operations and Force Development Division, had the authority to
initiate and approve funding for the SLTP initiative. Rather, to the very limited extent that he
was involved in the initiative, he was instructed to act his superior officers, most notably LTG
Plewes. Exhibit 36, October 21, 1998 Memorandum of LTG Plewes. Thus, the DAIG grossly